[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 421.]

THE STATE OF OHIO, APPELLANT, *v.* HOMAN, APPELLEE.

[Cite as *State v. Homan*, 2000-Ohio-212.]

*Criminal procedure—Police must strictly comply with established, standardized procedures in administering field sobriety tests—R.C. 2945.72(E) does not extend the time within which a criminal defendant must be brought to trial when the state files additional related charges after the defendant files a pretrial motion.*

1. In order for the results of a field sobriety test to serve as evidence of probable cause to arrest, the police must have administered the test in strict compliance with standardized testing procedures.

2. When a criminal defendant files a pretrial motion and the state later files against the defendant additional, related criminal charges, R.C. 2945.72(E) does not extend the time within which the defendant must be brought to trial on those additional charges.

(No. 99-1107—Submitted April 26, 2000—Decided August 16, 2000.)

APPEAL from the Court of Appeals for Erie County, No. E-97-100.

_____

{¶ 1} On October 25, 1996, Trooper Andrew R. Worcester of the Ohio State Highway Patrol stopped a vehicle driven by appellee, Marie Homan, who was traveling with her six-year-old daughter. As a result of this vehicle stop, appellee was ultimately charged with driving under the influence ("DUI") in violation of R.C. 4511.19(A)(1), driving left of center in violation of R.C. 4511.25(C), and child endangering in violation of R.C. 2919.22(C)(1).

{¶ 2} At appellee's trial, Trooper Worcester testified that he stopped appellee's vehicle after twice witnessing appellee drive left of center. When Trooper Worcester approached appellee's vehicle, he smelled a strong odor of

alcohol on appellee's breath and observed appellee's eyes to be red and glassy. Trooper Worcester administered the horizontal gaze nystagmus ("HGN"),[1] walk-and-turn,[2] and one-leg-stand[3] tests. Trooper Worcester testified that, based upon the results of these field sobriety tests, appellee's demeanor, and appellee's own admission that she had consumed three beers, he placed appellee under arrest.

{¶ 3} During cross-examination, Trooper Worcester testified that, in administering to appellee the HGN and walk-and-turn tests, he at times deviated from established testing procedures. With respect to the HGN test, for example, Trooper Worcester testified that, in observing appellee's eyes for nystagmus at maximum deviation, he did not hold appellee's eyes at maximum deviation for a full four seconds as standardized procedures require. In addition, in determining at what angle appellee's eyes began to exhibit nystagmus, Trooper Worcester did not, as recommended, move the stimulus at a pace that would take a full four seconds

---

1. The HGN test is one of several field sobriety tests used by police officers in detecting whether a driver is intoxicated. "Nystagmus" is an involuntary jerking of the eyeball. "Horizontal gaze nystagmus" refers to a jerking of the eyes as they gaze to one side. The position of the eye as it gazes to one side is called "maximum deviation." In administering the test, an officer takes some object, a pen for example, and places it approximately twelve to fifteen inches in front of the suspect's nose. The officer then observes the suspect's eyes as they follow the object to determine at what angle nystagmus occurs. The more intoxicated a person becomes, the less the eyes have to move toward to the side before nystagmus begins. Cohen & Green, Apprehending and Prosecuting the Drunk Driver: A Manual for Police and Prosecution (1997), Section 4.04[2][a]. Other signs of intoxication include distinct nystagmus at maximum deviation and the inability of the suspect's eyes to smoothly follow the object. See 1 Erwin, Defense of Drunk Driving Cases (3 Ed.1997), Sections 10.04[5] and 10.06[1].

2. The walk-and-turn test requires the suspect to walk a given number of steps, heel-to-toe, in a straight line. The suspect is then told to turn around and walk back in the same manner. During the test, the suspect is told to keep his or her hands at his or her sides. The officer assesses a suspect's performance according to the degree to which the suspect exhibits a lack of balance or coordination. Erwin, at Section 10.03[2].

3. The one-leg-stand test requires the suspect to stand with his or her feet together and his or her arms at his or her sides. The suspect is then told to hold one leg straight and forward about eight to twelve inches off the ground for approximately thirty seconds. While in this position, the suspect counts off the number of seconds. At all times, the suspect is to keep his or her arms at his or her sides and to watch his or her raised foot. The officer demonstrates the test before administering it. Erwin, at Section 10.04[1].

to move appellee's eyes from a forward gaze to the right. It took Trooper Worcester only one to two seconds to make the pass.

**{¶ 4}** Trooper Worcester also admitted to deviating from established police practice by conducting the walk-and-turn test between his patrol car and appellee's car. In addition, Trooper Worcester gave appellee the option of turning either to the right or the left after completing the required number of steps. Police procedure requires that the suspect turn to the left. Trooper Worcester also erred in the manner in which he instructed appellee on how to perform this test. Trooper Worcester testified that he did not, as required by police training manuals, instruct appellee on how to conduct the test while the appellee stood, on the testing line, with her right foot placed in front of her left. The record also indicates that the walk-and-turn test was conducted on a gravel-covered, uneven surface of road when a flat surface is required to perform the test.

**{¶ 5}** On November 4, 1996, appellee filed a speedy trial waiver. At this point, appellee faced charges of DUI and driving left of center. On November 21, appellee filed a motion to suppress the evidence gathered by the state as a result of the vehicle stop, arrest, and subsequent detention. In this motion, appellee argued, *inter alia*, that, because Trooper Worcester did not administer the field sobriety tests in strict compliance with standardized methods and procedures, the results of these tests were unreliable and could not serve as the basis for probable cause to arrest. In an order dated May 2, 1997, the Erie County Court held that, taken as a whole, the field sobriety tests indicated sufficient impairment to support a finding of probable cause, notwithstanding Trooper Worcester's failure to strictly comply with established police procedures. In the intervening months between appellee's filing of the motion to suppress and the trial court's order, appellee was charged with child endangering. Appellee's trial commenced on July 17, 1997.

**{¶ 6}** On the morning of trial, appellee filed a motion to dismiss the child endangering charge on speedy trial grounds. The trial court denied the motion; it

concluded that, under R.C. 2945.72, appellee's filing of the motion to suppress tolled the time in which she had to be brought to trial on the child endangering charge even though her motion preceded the filing of this charge. Thereafter, appellee entered a plea of no contest to child endangering. Appellee proceeded to trial on the charges of DUI and driving left of center. At the conclusion of this trial, a jury returned a verdict of guilty on the DUI charge. The trial court found appellee guilty of driving left of center.

{¶ 7} Appellee appealed to the Sixth District Court of Appeals, arguing that the trial court improperly admitted the results of the field sobriety tests and erred in concluding that the filing of the motion to suppress tolled the time in which she had to be brought to trial on the charge of child endangering. The court of appeals agreed that the trial court improperly admitted the results of the field sobriety tests as evidence of probable cause. The court of appeals held that because Trooper Worcester did not strictly comply with standardized testing procedures in administering the HGN and walk-and-turn tests, these tests could not form the basis for probable cause to arrest. However, the court of appeals concluded that, even with the suppression of the HGN and walk-and-turn tests, there remained sufficient evidence upon which Trooper Worcester could have relied in arresting appellee. The court of appeals also concluded that the trial court should have dismissed the child endangering charge. Construing R.C. 2945.72, the court of appeals held that, because the child endangering charge was filed after the motion to suppress, the motion to suppress did not toll the time in which appellee had to be brought to trial on this charge.

{¶ 8} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Kevin J. Baxter*, Erie County Prosecuting Attorney, and *Mary Ann Barylski*, Assistant Prosecuting Attorney, for appellant.

*Gardner & Kucharski*, *Mark Gardner* and *Timothy J. Kucharski*, for appellee.

*Donald W. White*, Clermont County Prosecuting Attorney, and *David H. Hoffmann*, Assistant Prosecuting Attorney, urging reversal for *amicus curiae*, Ohio Prosecuting Attorneys Association.

———————————

**FRANCIS E. SWEENEY, SR., J.**

{¶ 9} This case presents two issues for our consideration. First, we are asked to consider whether, in administering field sobriety tests, the police must strictly comply with established, standardized procedures. The second issue concerns R.C. 2945.72(E), which provides that pretrial motions instituted by criminal defendants extend the time within which they must be brought to trial. Appellant contends that this extension can apply to additional, related charges brought against the defendant after the motion is filed.

{¶ 10} For the reasons that follow, we conclude that in order for the results of a field sobriety test to serve as evidence of probable cause to arrest, the police must have administered the test in strict compliance with standardized testing procedures. We also determine that when a criminal defendant files a pretrial motion and the state later files against the defendant additional, related criminal charges, R.C. 2945.72(E) does not extend the time within which the defendant must be brought to trial on those additional charges.

I

{¶ 11} When field sobriety testing is conducted in a manner that departs from established methods and procedures, the results are inherently unreliable. In an extensive study, the National Highway Traffic Safety Administration[4]

———————————

4. The NHTSA has been a leader in the study and development of field sobriety testing policy and procedure. The NHTSA's standardized test manuals form the basis for manuals used by state law enforcement agencies across the country. Taylor, Drunk Driving Defense (5 Ed.2000), Section 4.3.2.

("NHTSA") evaluated field sobriety tests in terms of their utility in determining whether a subject's blood-alcohol concentration is below or above the legal limit. The NHTSA concluded that field sobriety tests are an effective means of detecting legal intoxication "only when: the tests are administered in the prescribed, standardized manner[,] * * * the standardized clues are used to assess the suspect's performance[, and] * * * the standardized criteria are employed to interpret that performance." National Highway Traffic Safety Adm., U.S. Dept. of Transp., HS 178 R2/00, DWI Detection and Standardized Field Sobriety Testing, Student Manual (2000), at VIII-3. According to the NHTSA, "[i]f any one of the standardized field sobriety test elements is changed, the validity is compromised." *Id.* Experts in the areas of drunk driving apprehension, prosecution, and defense all appear to agree that the reliability of field sobriety test results does indeed turn upon the degree to which police comply with standardized testing procedures. See, *e.g.*, 1 Erwin, Defense of Drunk Driving Cases (3 Ed.1997), Section 10.06[4]; Cohen & Green, Apprehending and Prosecuting the Drunk Driver: A Manual for Police and Prosecution (1997), Section 4.01.

{¶ 12} We too have recognized that while field sobriety tests are a potentially effective means of identifying intoxicated drivers, these tests' reliability depends largely upon the care with which they are administered. In *State v. Bresson* (1990), 51 Ohio St.3d 123, 554 N.E.2d 1330, we considered whether a police officer may testify at trial regarding a driver's performance on the HGN test as it pertains to the issue of probable cause. In holding that such testimony is admissible, we stressed the importance of the testing process. We noted that the arresting officer's knowledge of the test, his training, and his ability to interpret his observations are key considerations in determining admissibility. *Id.*, 51 Ohio St.3d at 129, 554 N.E.2d at 1336. Although the only test at issue in *Bresson* was the HGN, we suggested that these strict prerequisites to admissibility would also apply to the other field sobriety tests, including the walk-and-turn and one-leg-stand tests. *Id.*

{¶ 13} The small margins of error that characterize field sobriety tests make strict compliance critical. Here, for example, Trooper Worcester's failure to use the full four seconds when checking for the onset of nystagmus, while seemingly trivial, rendered the results of this test unreliable. When a police officer moves the stimulus too quickly, he or she runs the risk of going past the point of onset or missing it altogether. NHTSA Student Manual, at VIII-8.

{¶ 14} The HGN test is not the only field sobriety test that requires special care in its administration. With respect to the walk-and-turn test, for example, it is important that the investigating officer have the suspect balance heel-to-toe while listening to his or her instructions on how to perform the test, a step that was omitted by Trooper Worcester. The ability or inability of the suspect to keep his or her balance while simultaneously listening to instructions is an important test clue. NHTSA Student Manual, at VIII-11. Even the seemingly straightforward one-leg-stand test requires precise administration. For instance, a police officer must make sure that the suspect keeps his or her foot elevated for the full thirty-second duration. Some intoxicated persons can competently perform the test for up to twenty or twenty-five seconds. Erwin, at Section 10.04[1].

{¶ 15} Although in a number of our DUI cases we adopt a rule of substantial compliance, we find these cases to be inapposite. Two representative cases, *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902, and *State v. Steele* (1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740, illustrate the important differences between our substantial-compliance cases and the case now before us.

{¶ 16} In *Plummer*, we held that the police need only substantially comply with an administrative regulation that required urine specimens to be refrigerated when not in transit or under examination. Accordingly, a three- to four-hour interval of non-refrigeration did not render the results of a subsequent urinalysis test inadmissible at a DUI trial. In reaching our holding, we noted that the refrigeration

requirement contemplated situations involving longer periods of non-refrigeration than that at issue in *Plummer*. *Plummer*, 22 Ohio St.3d at 295, 22 OBR at 464, 490 N.E.2d at 905. We further noted that strict compliance with this regulation would not always be realistic or humanly possible. *Id.*, 22 Ohio St.3d at 294, 22 OBR at 463, 490 N.E.2d at 905.

{¶ 17} Similarly, in *Steele*, we held that strict compliance with Department of Health regulations in regard to breathalyzer testing was not necessary in order for the test results to be admissible at trial. At issue in *Steele* was a Department of Health regulation that required arresting officers to visually observe the suspect for twenty-minutes prior to testing so as to prevent the suspect from orally ingesting any substance. We found that this requirement had been fulfilled even though the arresting officer had averted his gaze from the suspect for a few seconds while he exited and walked around his patrol car. We noted that because there was no evidence to suggest that the suspect had in any way corrupted the test results during the few seconds that the officer had departed, the purpose of the rule had not been undermined. *Steele*, 52 Ohio St.2d at 190, 6 O.O.3d at 419-420, 370 N.E.2d at 742.

{¶ 18} Cases such as *Plummer* and *Steele* are distinguishable from the case at bar. In the substantial-compliance cases, the minor procedural deviations that were at issue in no way affected the ultimate results. In contrast, it is well established that in field sobriety testing even minor deviations from the standardized procedures can severely bias the results. Moreover, our holdings in the substantial-compliance cases were grounded, at least in part, on the practical impossibility of strictly complying with the applicable administrative regulations. In contrast, we find that strict compliance with standardized field sobriety testing procedures is neither unrealistic nor humanly impossible in the great majority of vehicle stops in which the police choose to administer the tests.

{¶ 19} In determining whether the police had probable cause to arrest an individual for DUI, we consider whether, at the moment of arrest, the police had

sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence. *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145; *State v. Timson* (1974), 38 Ohio St.2d 122, 127, 67 O.O.2d 140, 143, 311 N.E.2d 16, 20. In making this determination, we will examine the "totality" of facts and circumstances surrounding the arrest. See *State v. Miller* (1997), 117 Ohio App.3d 750, 761, 691 N.E.2d 703, 710; *State v. Brandenburg* (1987), 41 Ohio App.3d 109, 111, 534 N.E.2d 906, 908.

{¶ 20} In the case *sub judice*, Trooper Worcester, the arresting officer, admitted to having not strictly complied with established police procedure when administering to appellee the HGN and walk-and-turn tests. We nevertheless agree with the court of appeals that the totality of facts and circumstances surrounding appellee's arrest supports a finding of probable cause.

{¶ 21} While field sobriety tests must be administered in strict compliance with standardized procedures, probable cause to arrest does not necessarily have to be based, in whole or in part, upon a suspect's poor performance on one or more of these tests. The totality of the facts and circumstances can support a finding of probable cause to arrest even where no field sobriety tests were administered or where, as here, the test results must be excluded for lack of strict compliance.

{¶ 22} Prior to stopping appellee's vehicle, Trooper Worcester observed erratic driving on the part of appellee. Upon stopping appellee's vehicle, he observed that appellee's eyes were "red and glassy" and that her breath smelled of alcohol. Appellee admitted to the arresting officer that she had been consuming alcoholic beverages. The totality of these facts and circumstances amply supports Trooper Worcester's decision to place appellee under arrest. See *Mason v. Murphy* (1997), 123 Ohio App.3d 592, 598, 704 N.E.2d 1260, 1263; *State v. Beall* (Mar. 8, 1999), Belmont App. No. 94-B-43, unreported, 1999 WL 148371.

II

**{¶ 23}** Appellant contends that appellee's motion to suppress tolled the time in which appellee had to be brought to trial on the child endangering charge, which was filed subsequent to the filing of the motion to suppress. We disagree.

**{¶ 24}** Under R.C. 2919.22, driving a motor vehicle while intoxicated with one or more children in the car constitutes child endangering. A violation of this law is a first-degree misdemeanor. R.C. 2919.22(E)(5)(a). A defendant charged with a misdemeanor of the first degree must be brought to trial within ninety days after arrest. R.C. 2945.71(B)(2). This period of time may be extended by "[a]ny period of delay necessitated by reason of * * * motion * * * instituted by the accused." R.C. 2945.72(E). This extension is strictly construed in favor of the defendant. *State v. Singer* (1977), 50 Ohio St.2d 103, 109, 4 O.O.3d 237, 240, 362 N.E.2d 1216, 1220.

**{¶ 25}** The question presented is whether R.C. 2945.72(E) applies where the filing of the motion precedes the filing of the criminal charge. Because an answer to this question does not appear on the face of the statute, we invoke rules of statutory construction in order to arrive at the legislature's intent. *Symmes Twp. Bd. of Trustees v. Smyth* (2000), 87 Ohio St.3d 549, 553, 721 N.E.2d 1057, 1061. R.C. 1.49 sets forth specific rules of statutory construction, which serve as guideposts for courts to follow in interpreting ambiguous statutes. Included among them are the object sought to be attained by the legislature and the consequences of a particular construction. Applying these guideposts, we conclude that tolling was not intended to occur for charges filed subsequent to the defendant's motion filing.

**{¶ 26}** The facts of the instant case are analogous to those in *State v. Adams* (1989), 43 Ohio St.3d 67, 538 N.E.2d 1025. In *Adams*, we held that when a defendant waives his right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of facts that are brought subsequent to the waiver. We attributed our holding in *Adams* to the objective underlying Ohio's speedy trial statutes—that the ability of a defendant to maintain

his or her defense not be impaired. *Id.*, 43 Ohio St.3d at 70, 538 N.E.2d at 1028. We noted in *Adams* that knowing and intelligent tactical decisions cannot be made until all of the facts are known by the accused, and this, of course, includes knowing the exact nature of the crimes charged. *Id.*

{¶ 27} Here, as in *Adams*, the state's interpretation of Ohio's speedy trial law conflicts with the objective sought to be achieved by the General Assembly. Appellant's proposed construction of R.C. 2945.72(E) provides the state with an incentive to file charges piecemeal, as opposed to bringing all related charges at the same time. The potential prejudice to defendants is manifest. When a defendant is unaware of the precise nature of the crimes charged, he or she cannot make informed and intelligent tactical decisions about motion filings and other matters.

{¶ 28} For the foregoing reasons, we conclude that R.C. 2945.72(E) does not apply to charges filed by the state after the defendant's motion is filed. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., ROCCO and PFEIFER, JJ., concur.

ROCCO, J., concurs separately.

COOK and LUNDBERG STRATTON, JJ., concur in judgment and dissent in part.

DOUGLAS, J., dissents.

KENNETH A. ROCCO, J., of the Eighth Appellate District, sitting for RESNICK, J.

_____

**ROCCO, J., concurring.**

{¶ 29} I agree with the majority that field sobriety test results can provide probable cause to arrest only if the administering officer strictly complies with the standardized testing procedures. I write separately to emphasize an additional point.

{¶ 30} I would extend the court's holding here to explicitly state that field sobriety test results are admissible at trial only if the officer strictly complied with standardized testing procedures. The majority has demonstrated that the care with which a field sobriety test is administered has a decisive effect on the test's reliability, and hence its evidentiary value. It seems self-evident to me that if strict compliance with testing procedures is necessary to demonstrate probable cause to arrest, it becomes even more necessary if the tests are to be used to prove guilt.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 31} I concur with the majority in that the filing of a motion before an additional charge is brought does not toll the speedy-trial provisions for that charge under R.C. 2945.72(E). Prosecutors should refile applicable motions or require defendant's counsel to refile their motions if the motions also apply to the new charge in order to extend speedy-trial provisions to those later charges.

{¶ 32} However, I disagree with the majority's conclusion that field sobriety tests require strict compliance. Field sobriety tests are used by arresting officers to assist in determining whether probable cause exists to arrest the driver for driving under the influence of drugs or alcohol. Field sobriety tests are not constitutionally required, nor are they mandated by statute. They are not even required by the Department of Health or any traffic regulation. They are merely *procedures* established by the National Highway Traffic Safety Administration ("NHTSA"). As such, they are only evidentiary tools.

{¶ 33} In 1986, this court examined the level of compliance required in administering regulations concerning storage temperature of urine samples taken from suspected impaired drivers. This court held that "absent a showing of prejudice to a defendant, the results of a urine-alcohol test administered in substantial compliance with Ohio Adm.Code 3701-53-05 are admissible in a prosecution under R.C. 4511.19." *State v. Plummer* (1986), 22 Ohio St.3d 292, 22

OBR 461, 490 N.E.2d 902, syllabus. Because the court required only substantial compliance, rather than strict compliance, for those regulations, the evidentiary value of the item decreased as substantial compliance decreased. But even at a substantial-compliance level, rather than a strict-compliance level, the test retained strong evidentiary value.

{¶ 34} Similarly here, substantial compliance affects the *evidentiary value* of the field sobriety tests. But substantial compliance should not result in the tests' *exclusion*. If *Plummer* only requires substantial compliance with the Ohio Administrative Code for the admissibility of chemical test readings for a strict-liability statute, I would find that only substantial compliance should be required for administering the field sobriety tests in question.

{¶ 35} The majority notes that according to the NHTSA, "[i]f any one of the standardized field sobriety test elements is changed, the validity is compromised." National Highway Traffic Safety Adm., U.S. Dept. of Transp., HS 178 R2/00, DWI Detection and Standardized Field Sobriety Testing, Student Manual (2000), at VIII-3. Again, this potential compromise in validity can be challenged by the defense on the basis of reliability. A trial court can conduct a pretrial hearing on whether the tests are sufficiently reliable to be admissible, just as a trial judge conducts similar hearings on other evidentiary issues. Even if the trial judge finds that there was substantial compliance with the field sobriety tests so as to make these tests admissible, defense counsel can still attack the tests' reliability as evidence at trial, depending on the degree of compliance. The NHTSA testing only confirms that the better the compliance, the better the reliability.

{¶ 36} The majority highlights *Plummer*'s observation that strict compliance is "not always realistically or humanly possible" regarding urine test regulations. *Id.*, 22 Ohio St.3d at 294, 22 OBR at 463, 490 N.E.2d at 905. However, field sobriety tests are often administered in the dark, on icy roads, on gravel, during wind and rain. Law enforcement officers do not have the ability to

select the ideal environment. Thus, so too with field sobriety tests, I believe that strict compliance is not always realistically or humanly possible.

{¶ 37} I fear that this ruling will substantially hamper the effectiveness of law enforcement officers in their ability to ascertain probable cause for OMVI arrests. Defense counsel can now attack any minor deviation from the field sobriety tests and seek exclusion of the tests. At a time when more tools are needed in the effort to combat drunk driving, we have greatly reduced the effectiveness of one of those tools, field sobriety tests.

{¶ 38} I believe that strict compliance is neither constitutionally nor statutorily mandated, and certainly not mandated by any evidentiary rules. Therefore, I respectfully concur in the judgment, but dissent in part and would find that substantial compliance, not strict compliance, is the appropriate standard for the admissibility of field sobriety tests.

COOK, J., concurs in the foregoing opinion.

_____